UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------x
VICTORIA DEMTCHENKO, E. D. and A. D.,
infants, by their parent and natural guardian
Victoria Demtchenko, and ROBERT BYRD,

         Plaintiffs,   FIRST AMENDED COMPLAINT
                & JURY DEMAND

 - against -

                08 CV 861 (PKC)

DANIEL TUFFARELLI, a caseworker
employed by the New York City
Administration for Children's Services,
ERIC SANFORD, a supervisor employed by
the New York City Administration for
Children's Services, RODNEY JACKSON, a
supervisor employed by the New York City
Administration for Children's Services,
ERCAN AYDIN, an officer employed by the
New York City Police Department, EDWARD
MCGANN, an officer employed by the New
York City Police Department, and the CITY
OF NEW YORK,

         Defendants.
------------------------------------------------------------x

  Plaintiffs, complaining of the defendants, allege as follows:

I. Introduction

  1. In this action, plaintiffs seek money damages against defendants for (i) the violation, under color of state law, of civil rights guaranteed under the United States Constitution, and (ii) the violation of related rights guaranteed under state law.

  2. Damages are sought based on defendants' actions in (i) illegally entering plaintiffs' home, seizing and removing the infant plaintiffs, E. D. and A. D., from the care and custody of plaintiffs Victoria Demtchenko and Robert Byrd, detaining the said infant plaintiffs for six days, and (ii) maliciously prosecuting a baseless child protective

proceeding against plaintiffs Victoria Demtchenko and Robert Byrd in Family Court, New York County (said proceeding was finally dismissed by the Supreme Court, Appellate Division, First Department, on November 1, 2007).

II. Jurisdiction/Venue

3. Plaintiffs bring this action against defendants under 28 U.S.C. §§ 1331, 1343(a)(3), (4) to redress the deprivation of rights secured by plaintiffs under the First, Fourth, and Fourteenth Amendments to the United States Constitution.

4. Plaintiffs also invoke supplemental jurisdiction for state law violations under 28 U.S.C. § 1367, given that state law claims arise as a part of the same case or controversy.

5. Venue is proper in the Southern District of New York under 28 U.S.C § 1391.

III. Parties

6. Plaintiff Victoria Demtchenko is the mother of plaintiffs E. D. (now age 12) and A. D. (now age 4), respectively. Plaintiff Robert Byrd is the father of plaintiff E. D. At all relevant times, plaintiffs resided, and they continue to reside, at 320 East 49th Street #55, New York, New York 10017.

7. At all relevant times, defendant Daniel Tuffarelli was a caseworker employed by the New York City Administration for Children's Services. He is sued in his individual capacity.

8. At all relevant times, defendant Eric Sanford was a supervisor employed by the New York City Administration for Children's Services. He is sued in his individual capacity.

9. At all relevant times, defendant Rodney Jackson was a supervisor employed by the New York City Administration for Children's Services. He is sued in his individual capacity.

10. At all relevant times, defendant Ercan Aydin was an officer employed by the New York City Police Department. He is sued in his individual capacity.

11. At all relevant times, defendant Edward McGann was an officer employed by the New York City Police Department. He is sued in his individual capacity.

12. Defendant city of New York is a municipal corporation, incorporated under the laws of the state of New York. It operates and governs the New York City Administration for Children's Services (hereafter "ACS") and the New York Police Department pursuant to the laws of the state of New York.

IV. Statement of Claim

13. Plaintiff Victoria Demtchenko holds a master's degree in special education. On October 30, 2006, she was on maternity leave as a special education teacher with the New York City public schools.

14. Plaintiff Robert Byrd holds a doctorate in educational theater and worked previously as a college professor. On October 30, 2006, he worked for a tour company as a guide.

15. Plaintiff E. D. suffers from autism, mild retardation, and oppositional disorder. He is a special needs child.

16. On October 30, 2006, E. D. was enrolled in the Brooklyn Blue Feather Elementary School (hereafter "Blue Feather") in Carroll Gardens, Brooklyn. E. D. was

3

enrolled at Blue Feather between September 2005 and December 2006, at which time he was transferred to the Rebecca School in Manhattan.

17. Beginning early in the 2005 – 2006 school year, E. D. became increasingly resistant to attending Blue Feather. In the mornings, he would become agitated and violent, throw tantrums while lying down on the floor, scream, experience diarrhea or wet his pants, and/or simply refuse to get dressed and leave the house.

18. As a special education teacher, plaintiff Victoria Demtchenko has received substantial training in dealing with the problems of autistic children, such as E. D. Despite her training, she was physically unable to get E. D. to leave the house or onto the bus because he is very large for his age. He simply refused to go by engaging in the above behavior.

19. The reasons E. D. often refused to attend school were because he was facing multiple difficulties, including:

   a) The length of E. D.'s bus ride from his home at 320 East 49th Street in Manhattan to Blue Feather in Carroll Gardens, Brooklyn, took two and a half hours each way. (This is noteworthy given that a direct ride could have been accomplished in far less time. The bus route extended the trip by hours.)

   b) E. D. had to remain on the bus throughout the entire ride, even when there were often delays. Accordingly, he could not get to a bathroom when he needed one.

   c) Edward's pediatrician, Dr. Kevin Charlotten, the medical director at the Association for the Help of Retarded Children (known as AHRC), wrote a letter to the school advising that the length of this bus ride was inappropriately long,

considering Edward's challenges. Dr. Charlotten recommended that the bus ride (i.e., the time it took to take E. D. to school) be shortened, if at all possible.

d) E. D. sometimes defecated on himself while sitting on the bus during these lengthy rides to school.

e) Plaintiff Victoria Demtchenko reported the situation to Blue Feather, including that the school bus matron and driver were abrupt and insensitive to the situation.

f) Plaintiff Victoria Demtchenko also reported to the school that she personally had observed school personnel treating E. D. in a harsh, non-professional manner.

20. Plaintiff Victoria Demtchenko turned to Blue Feather because of these issues, and requested assistance with the problem of getting E. D. to school over a considerable period of time. Her efforts to get assistance from Blue Feather included approaching E. D.'s teacher, the head teacher, the school social worker, the school psychologist, and the principal.

21. With respect to the school psychologist, plaintiff Victoria Demtchenko suggested that the bus ride to and from Blue Feather, at two and a half hours each way, was too long for E. D. The response she received was dismissive. The school psychologist advised plaintiff Victoria Demtchenko that Blue Feather had no control over the New York City Department of Pupil Transportation. The other professionals at Blue Feather offered little more.

22. Although Blue Feather did almost nothing constructive to help plaintiff Victoria Demtchenko, they did file a report with the Central State Register in July 2006 in which they reported that E. D. had not been attending school regularly. ACS

5

investigated and subsequently determined the report to be "unfounded" in September 2006.

23. Plaintiff Victoria Demtchenko also sought out other resources and raised E. D.'s school resistance problem with professionals outside of Blue Feather. Through ACS, Ms. Demtchenko was referred for assistance to YAI/National Institute for People with Disabilities. (Plaintiff Victoria Demtchenko participated in this program, but E. D.'s refusal to attend Blue Feather continued unabated.) She also wrote to the Department of Pupil Transportation but again had no success. (The bus route remained the same.) Plaintiff Victoria Demtchenko also raised the school resistance issue at a Committee on Special Education meeting. (The problem was noted, but there was no intervention or suggested strategy offered in response.)

24. To address the situation, plaintiff Victoria Demtchenko began to search for a new school for E. D., and she told the Blue Feather school social worker that she had commenced that process. Among other professionals, she consulted repeatedly with E. D.'s neuropsychologist. Plaintiff Victoria Demtchenko identified the Rebecca School as a possibility for E. D. and learned that its annual tuition was $72,500. Accordingly, she also consulted an education lawyer to see whether the state would pay the tuition.

25. Working with E. D.'s neuropsychologist and the education lawyer, plaintiff Victoria Demtchenko was finally able to have E. D. transferred to the Rebecca School, which he began attending on December 4, 2006. The school is located at 40 East 30th Street in Manhattan, a short bus ride away from his home. E. D.'s tuition is paid by the state.

26. According to E. D.'s neuropsychologist, plaintiff Victoria Demtchenko has always had a good understanding of E. D.'s needs – educational and otherwise – and of his behavior and functioning.

27. On Wednesday, October 25, 2006, plaintiff Robert Byrd came home at about 3:00 P.M. As was his practice, plaintiff Robert Byrd buzzed the intercom to the apartment from the ground floor and asked if E. D. wanted to go out for a milk shake. E. D. wanted to go and, as was the custom, he left the apartment on the fifth floor and started to walk down the stairs to where his father was waiting for him on the ground floor.

28. After E. D. departed, plaintiff Victoria Demtchenko closed the door to the apartment. She then heard a stumbling sound, opened the door, ran out, and saw E. D. sitting on the last (seventh) step before the landing immediately below. Initially, E. D. did not cry, though he began to do so after he heard plaintiff Demtchenko exclaim, "Oh no!"

29. When E. D. stated to cry, plaintiff Victoria Demtchenko rushed back into the apartment, grabbed hold of then two-year-old A. D., and went down to the now screaming E. D. The only mark or bruise that plaintiff Victoria Demtchenko was able to observe on E. D. was a pinkish color on his cheek.

30. Plaintiff Victoria Demtchenko immediately took both children and went down to the ground floor during which time E. D. had stopped crying and screaming. When E. D. saw plaintiff Robert Byrd, he started to cry again. At that point, the milk shake plan was abandoned, and they all went back up to the apartment.

31. E. D. did not limp or hesitate as he climbed back up the stairs. Although he is able to express pain, E. D. did not do so.

32. When they reached the apartment, plaintiff Victoria Demtchenko applied antibacterial medication to E. D.'s bruised cheek. E. D. himself then went to the freezer and put an ice pack on this cheek.

33. When they got into the apartment, plaintiff Robert Byrd nonetheless got E. D. to lie down and checked E. D.'s legs and arms to see if there were any indications of a bruise, muscle pull or a fracture. There appeared to be nothing wrong, and E. D. did not cry out in any way. The only manifestation of any injury was that E. D.'s face was scratched, but no bruise was showing at that time.

34. Plaintiff Robert Byrd stayed with E. D. for a while, checking to make sure that he did not appear sleepy and continued to be responsive. Plaintiff Victoria Demtchenko came into the room with more medication (an antibacterial cream) for the scratch on E. D.'s face. After watching a video, E. D. felt better, and wanted to get the milk shake, so plaintiff Robert Byrd and E. D. walked downstairs together and went out to get it. After they returned home, E. D. went to bed.

35. On Thursday, October 26, 2006 (the day after E. D. fell on the stairs), he again refused to go to school. As always, plaintiff Victoria Demtchenko called Linda Perez, the head teacher at Blue Feather, and told her that E. D. would not be at school. Plaintiff Victoria Demtchenko gave Ms. Perez an excuse – she said that E. D. could not go to school because he fell down. She told Ms. Perez that he was limping, when he was not.

36. Plaintiff Victoria Demtchenko later conceded in testimony in Family Court that she had not accurately described E. D.'s physical condition and what had happened to E. D. She acknowledged that she had lied to Ms. Perez because "when I failed to send him to school again and again, I was terrified that she (Ms. Perez) was going to ... put pressure on ACS to force E. D. into an institution if he is not going to go to school and I felt I could save him from an institution, just to take advantage of the bruise and use it to my[] advantage." Plaintiff Victoria Demtchenko tearfully acknowledged to the court that, in retrospect, her failure to be candid "was a terrible idea. Horrible. It was wrong."

37. On Friday, October 26, 2006, Blue Feather filed another report with the Central State Register that E. D. had not been attending school regularly. Thereafter, ACS assigned a caseworker, defendant Daniel Tuffarelli, to investigate. He appeared unannounced at plaintiffs' home during dinnertime on Friday, October 27, 2006, to investigate the report filed by Blue Feather.

38. When defendant Daniel Tuffarelli appeared at plaintiffs' home on October 27, 2006, he was dressed casually, wearing a muscle shirt and with a toothpick in his mouth. Shortly thereafter, plaintiff Robert Byrd arrived home from work, participated in the discussion that was going on for a few minutes, and then asked defendant Daniel Tuffarelli to leave. Defendant Tuffarelli, who had only recently been hired by ACS and was in his early twenties, did leave but was enormously angered for being asking to do so and threatened over his shoulder on the way out, "You're going to see me again sooner than you think."

39. About an hour later, after obtaining approval from his ACS supervisors (i.e., from defendants Eric Sanford and Rodney Jackson), defendant Daniel Tuffarelli did

return but with defendants Ercan Aydin and Edward McGann (officers employed by the New York City Police Department). Without a Family Court warrant or order and without consent, probable cause, or due process of law, defendants Daniel Tuffarelli, Ercan Aydin and Edward McGann entered plaintiffs' home and illegally seized and removed E. D. and plaintiff A. D. and placed them in "emergency" foster care. In taking these actions, defendant Daniel Tuffarelli acted with actual malice and in bad faith.

40. Three days later, on Monday, October 30, 2006, defendant Daniel Tuffarelli commenced a child protective proceeding under New York Family Court Act Article 10 against plaintiffs Demtchenko and Robert Byrd in Family Court, New York County.

41. On October 30, 2006, plaintiffs Victoria Demtchenko and Robert Byrd appeared in Family Court and demanded a preliminary hearing under New York Family Court Act § 1027 to determine whether the seizure of A. D. and E. D. and the continuation of "emergency" foster care were justified under state law or whether the children should be immediately returned to the custody of plaintiffs Victoria Demtchenko and Robert Byrd. Following a preliminary hearing, the Family Court determined that the "emergency" seizure of A. D. and E. D. was not justified and immediately ordered that the children be returned. ACS returned both children to plaintiffs Victoria Demtchenko and Robert Byrd on November 2, 2006.

42. Defendant Daniel Tuffarelli commenced and continued the child protective proceeding under New York Family Court Act Article 10 against plaintiffs Demtchenko and Robert Byrd with actual malice and without probable cause. The Supreme Court, Appellate Division, First Department, finally dismissed the proceeding on the merits on

November 1, 2007 (In re Alexander D., 45 A.D.3d 264, 845 N.Y.S.2d 244 (1st Dept. 2007)).

43. Within 90 days after the claims set forth in this complaint arose, plaintiffs served written notices of claim, sworn to under oath, on defendants' employer, the city of New York. At least 30 days have elapsed since the service of said notices of claim, and adjustment or payment thereof has been neglected or refused.

### First Cause of Action

44. Plaintiffs repeat the allegations set forth in paragraphs 1 through 43 above.

45. The actions of defendants Daniel Tuffarelli, Eric Sanford, Rodney Jackson, Ercan Aydin, and Edward McGann, as set forth above, personally violated plaintiffs' rights as guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution for which said defendants are individually liable.

46. As a direct and proximate result of defendants' acts and omissions, plaintiffs (i) suffered mental pain and anguish, deprivation of physical liberty and/or their familial right of association, and (ii) incurred legal and related expenses.

### Second Cause of Action

47. Plaintiffs repeat the allegations set forth in paragraphs 1 through 43 and 46 above.

48. Defendants had a duty and/or special duty to act with reasonable and/or heightened care toward plaintiffs.

49. The actions of defendants Daniel Tuffarelli, Eric Sanford, Rodney Jackson, Ercan Aydin, and Edward McGann, as set forth above, were within the scope of their public employment and in the discharge of their duties.

50. The actions of defendants, as set forth above, gravely violated their duty to act with reasonable and/or heightened care toward plaintiffs and constitute gross negligence under state law for which defendants are individually or vicariously liable.

### Third Cause of Action

51. Plaintiffs repeat the allegations set forth in paragraphs 1 through 43 and 46 above.

52. The actions of defendant Daniel Tuffarelli, as set forth above, were within the scope of his public employment and in the discharge of his duties.

53. The actions of defendant Daniel Tuffarelli, as set forth above, constitute malicious prosecution under state law for which defendants Daniel Tuffarelli and the city of New York are individually or vicariously liable.

### Fourth Cause of Action

54. Plaintiffs repeat the allegations set forth in paragraphs 1 through 43 and 46 above.

55. The actions of defendant Daniel Tuffarelli, as set forth above, were within the scope of his public employment and in the discharge of his duties.

56. The actions of defendant Daniel Tuffarelli, as set forth above, constitute abuse of process under state law for which defendants Daniel Tuffarelli and the city of New York are individually or vicariously liable.

V. Relief

WHEREFORE, plaintiffs demand judgment against defendants awarding:

a) Compensatory damages in an amount to be determined at trial;

b) Exemplary damages in an amount to be determined at trial;

c) Special damages in an amount equal to the legal and related expenses actually incurred in defending the state court litigation referenced above; and

d) Reasonable attorney's fees, all other costs, and interest.

### Jury Demand

Pursuant to Fed R. Civ. P. 38(b), plaintiffs hereby demand a trial by jury.

Dated: New York, New York
       April 28, 2008

SEGAL & GREENBERG LLP

By _/s/ Philip C. Segal_
Philip C. Segal (PS 8587)

179 Franklin Street
New York, New York 10013
psegal@segal-greenberg.com
(212) 297-0503

LOUGHLIN & LATIMER
131 Main Street
Hackensack, New Jersey 07601
slatimer@mindspring.com
(201) 487-9797

Attorneys for Plaintiffs